IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
June 17, 2025 Session

## CAROLINE BROWN SMITHWICK v. FRED BARKSDALE SMITHWICK, IV

**Appeal from the Circuit Court for Shelby County**
**No. CT-4078-20     Damita J. Dandridge, Judge**

_____

**No. W2024-00081-COA-R3-CV**
_____

Appellant/Mother appeals the trial court's grant of Appellee/Father's post-divorce petitions to modify the permanent parenting plan and for contempt. The trial court changed the children's primary residential parent from Mother to Father. Although the trial court made a change in custody, it applied Tennessee Code Annotated section 36-6-101(a)(2)(C), which addresses modification of a residential schedule. Tennessee Code Annotated section 36-6-101(a)(2)(B), which addresses modifications of custody, is the applicable statute. The trial court also charged Mother with one child's tuition. In doing so, the trial court failed to comply with the requirements of the Child Support Guidelines. As such, we vacate the order: (1) modifying the permanent parenting plan; (2) modifying the Child Support Worksheet, and (3) charging Mother with the child's private school tuition. The trial court also charged Mother with retroactive child support, found her guilty of three counts of civil contempt for alleged violations of the permanent parenting plan, and ordered her to pay Father's attorney's fees as punishment for the contempt. Because the record does not support the trial court's findings of contempt, we reverse the contempt holdings and the award of attorney's fees to Father. Because there is no basis for an award of retroactive child support, we also reverse that holding.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Vacated in Part; Reversed in Part; and Remanded**

KENNY ARMSTRONG, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and CARMA DENNIS MCGEE, J., joined.

Mitchell D. Moskovitz and Kirkland Bible, Memphis, Tennessee, for the appellant, Caroline Brown Smithwick.

Joseph W. Smith, Memphis, Tennessee, Donald Capparella and Jacob A. Vanzin,

Nashville, Tennessee, for the appellee, Fred Barksdale Smithwick, IV.

**OPINION**

**I. Background**

Appellant Caroline Brown Smithwick ("Mother") and Appellee Fred Barksdale Smithwick, IV ("Father") are the parents of three minor children, Eli (d/o/b December 2012), Ethan (d/o/b January 2014), and Ellie (d/o/b October 2016) (together, the "Children"). On March 17, 2021, the parties were divorced by final decree of the Circuit Court for Shelby County ("trial court"). In connection with their divorce, the parties agreed on a permanent parenting plan ("PPP") for the Children, and this plan was incorporated into the final decree of divorce. As relevant here, under the PPP, Mother was named primary residential parent, with 237 days; Father was granted 128 days. Based on their respective incomes and parenting time, Father was ordered to pay $605.00 per month in child support, and Mother had no support obligation. Concerning decision-making authority, the PPP provided:

**II. DECISION-MAKING**

**A. DAY-TO-DAY DECISIONS**

Each parent shall make decisions regarding the day-to-day care of a child while the child is residing with that parent, including any emergency decision affecting the health or safety of a Child.

**B. MAJOR DECISIONS**

Major decisions regarding each child shall be made as follows:

Educational decisions  . . .  joint
Non-emergency health care . . . joint
Religious upbringing . . . joint
Extracurricular activities . . . joint

The parties shall have a good faith duty to discuss all major decisions with one another and attempt to reach a joint decision . . . .
So long as Mother and/or her family remain responsible for paying the [C]hildren's private school tuition, Mother shall have final decision-making authority with regard to education. It is Mother's contemplation that the [C]hildren will remain in private school.
Dr. Siegel and Dr. Magdovitz are contemplated to remain the [C]hildren's pediatricians, and Dr. Byrd is contemplated to remain the

[C]hildren's dentist.

Concerning the Children's health insurance, the PPP provided:

## D. HEALTH AND DENTAL INSURANCE

       Reasonable health insurance on the child or children will be . . . maintained by the [M]other[.]
       Proof of continuing coverage shall be furnished to the other parent annually or as coverage changes.

On February 28, 2022, less than one year after the parties' divorce, Father filed a petition to modify the PPP. Therein, Father asserted that a material change in circumstances existed such that modification of the PPP was necessary and in the Children's best interests. Specifically, Father's petition stated:

> [T]here currently exists a material change in circumstances affecting the best interest of the minor children, in that the needs of the [C]hildren related to their age as well as significant changes in the parties' living conditions, along with other circumstances warrants modifying the residential schedule and final decision-making authority in the best interest of the minor children, pursuant to Tenn. Code Ann. § 36-6-101(a)(2)(c).

> ***

> [T]he [C]hildren's needs have changed since entry of the original [PPP], including changes to their developmental and emotional needs, academic curricula and requirements, extracurricular activities, and social lives. Thus, in light of those changes, it is in the best interest of the minor [C]hildren to spend equal amounts of time with Mother and Father.

In view of the alleged material change in circumstances, Father asked for the trial court to name the parties joint primary residential parents, with the Children spending equal time with both parents. Specifically, the amended parenting plan Father attached to his petition for modification proposed that the parties would be "Joint Primary Residential Parents (only if by agreement). Child must reside an equal amount of time with both parents." Concerning decision-making authority, Father's proposed amended parenting plan contemplated the following arrangement:

B. MAJOR DECISIONS
Major decisions regarding each child shall be made as follows:
Educational decisions . . . joint
Non-emergency health care . . . joint
Religious upbringing . . . joint
Extracurricular activities . . . joint

Final decision maker . . . Father
Summer Camps . . . joint

In his petition, Father expressed concern regarding the Children's education and specifically the choice of school. In relevant part, he averred:

6. Since entry of the [PPP], Mother has expressed to Father her desire for the parties' oldest and youngest children to attend Lakeland Elementary for the 2022-2023 academic school year, without justification. To maintain the minor [C]hildren's enrollment at Briarcrest Christian School for the 2022-2023 academic school year, Father has obligated himself to be financially responsible for the minor [C]hildren's tuition.

7. The parties' middle child, [Ethan,] is currently enrolled at The Bodine School for dyslexia. However, at the time the parties executed the [PPP] they intended for their son to transition to Briarcrest Christian School upon his graduation from The Bodine School. Upon [Ethan's] transition to Briarcrest Christian School, he will continue to receive support through the school's Educational Support Services program aka "ESS," which serves the needs of students diagnosed with learning disabilities and/or attention deficit disorder.

8. Father submits that it is in the best interest of the parties' oldest and youngest children to attend Briarcrest Christian School for the 2022-2023 academic school year. And upon graduating from The Bodine School, the middle child should be enrolled at Briarcrest Christian School along with his siblings.

9. Since they were toddlers, the parties' [C]hildren have been enrolled at Briarcrest Christian School, and Father has played a substantial rol[e] in their educational development and involvement in extracurricular activities.[1]

Based on the foregoing averments, Father asserted "that it is in the [C]hildren's best interest that he be designated final decision maker with respect to major decisions concerning the education and extracurricular activities of the minor [C]hildren." Father also asked for modification of his child-support obligation (from $605.00 per month to $49.00 per month). Father also asked for an award attorney's fees incurred in filing his petition.

On May 13, 2022, Father filed an amended petition "to add charges of civil contempt, and [to] request injunctive relief and attorney's fees." The amended petition incorporated the foregoing paragraphs of Father's original petition and added the following relevant averments:

1. Briarcrest Christian School's deadline to submit the re-enrollment

---

[1] By the time of the final hearing, the parties agreed that Eli and Ellie would attend Lakeland Elementary. Ethan would finish his studies at Bodine and then join his siblings at Lakeland. As such, we include Father's averments regarding the parties' initial dispute concerning where the Children would be enrolled for context only.

- 4 -

contracts for the 2022-2023 school year was January 18, 2022;

2. Shortly before the deadline, Father inquired . . . as to whether [Mother] had submitted the re-enrollment contracts to Briarcrest Christian School. Mother responded in the negative and explained that she was not going to submit them, because she intended for their [C]hildren to attend Lakeland Elementary School;

3. To maintain the minor [C]hildren's enrollment at Briarcrest Christian School for the upcoming school year, Father submitted to Briarcrest Christian School the reenrollment contracts on January 16, 2022;

***

6. . . . Father [has] learned that Mother not only enrolled the oldest and youngest child at Lakeland Elementary School for the 2022-2023 school year, but also unilaterally enrolled the youngest into Lakeland Elementary School's Kindergarten Camp, beginning May 31st through June 3rd.

Father further averred that Mother's decision to enroll the Children at Lakeland Elementary was "made out of convenience, not the [C]hildren's best interest." Father explained that Mother was engaged, and she and her fiancé "plan[ned] to purchase a house together this year; and thus, they desire for their children [Mother's fiancé has joint custody of his two children from a previous marriage] to attend Lakeland Elementary School. Consequently, it would be more convenient for Mother and [her fiancé] to transport their children to the same school rather than different schools."

In his amended petition, Father also alleged two counts of contempt against Mother for alleged violations of the PPP. Specifically, Father asserted that Mother had "willfully disobeyed Section II, ¶ B, of the [PPP] by unilaterally enrolling the parties' youngest daughter in Lakeland Elementary School's Kindergarten Summer Camp," and by "unilaterally enrolling the minor [C]hildren at Lakeland Elementary School for the 2022-2023 school year." As set out in context above, Section II, ¶ B of the PPP provides for joint decision making concerning the Children's education. Father also cited the PPP language that, "So long as Mother and/or her family remain responsible for paying the [C]hildren's private school tuition, Mother shall have final decision-making authority with regard to education. It is Mother's contemplation that the [C]hildren will remain in private school." Father asserted that he entered the PPP with the understanding that the Children would be enrolled at Briarcrest.

On June 27, 2022, Mother filed a response in opposition to Father's amended petition. In relevant part, Mother averred:

Mother admits that in the Fall of 2021, Mother notified Father that she desired to enroll Eli and Ellie in school at Lakeland Elementary. Mother denies that her desire to enroll the [C]hildren in school at Lakeland

- 5 -

Elementary was without justification.

*** 

Additionally, Eli and Ellie's stepbrother and stepsister, with whom the parties' [C]hildren have a close relationship, are enrolled in Lakeland schools for the 2022-2023 school year.

Mother denies that Father has obligated himself to be financially responsible for the minor [C]hildren's tuition at Briarcrest for the 2022-2023 school year. To the contrary, to date, Wife's parents have paid the [C]hildren's tuition and fees for the 2022-2023 school year at Briarcrest.

*** 

Mother alleges that there is no basis to modify the parties' [PPP], entered with this Court on March 17, 2021, less than one (1) year before Father filed the present Petition.

Mother expressly denies that the parties' [C]hildren's needs have changed since the parties' [PPP] was entered on March 17, 2021. . . . Mother further denies that this Honorable Court should modify the parties' parenting schedule, to which the parties agreed approximately one (1) year ago, and denies that a modification of said schedule is in the [C]hildren's best interests.

Mother denies that a material change in circumstances affecting the [C]hildren's best interests has occurred from March 17, 2021 through the present.

On July 8, 2022, Mother filed additional responses in opposition to Father's amended petition for modification of the PPP and for civil contempt. Therein, she averred in relevant part:

Mother admits that she enrolled the parties' minor daughter, Ellie, in Kindergarten Camp during Mother's summer parenting time, from May 31 to June 3, 2022, and admits that she submitted applications for enrollment for Ellie and Eli to Lakeland Elementary School for the 2022-2023 school year. Mother denies that the foregoing enrollment was in violation of the parties' [PPP].

*** 

Mother denies that her decision to enroll the [C]hildren in school at Lakeland Elementary School was "made out of convenience" and denies that said enrollment is contrary to the [C]hildren's best interests.

*** 

- 6 -

> Mother admits that she and [her fiancé] purchased a home located [in] Lakeland, Tennessee . . ., which is located less than a mile from Mother's former residence.

***

> Mother denies that she willfully disobeyed and/or violated the parties' Permanent Plan when she enrolled the parties' minor child in summer camp during approximately four (4) days of Mother's summer parenting time.
> Mother alleges that in the Fall of 2021, Mother notified Father that she desired to enroll Eli and Ellie in school at Lakeland Elementary. Mother further alleges that the parties' Permanent Parenting Plan details, "Mother shall have final decision-making authority with regard to education."

On July 11 and 12, 2022, the trial court heard Father's petition. By order of September 8, 2022, the trial court denied Father's petition to modify the PPP on its finding that "there is not a material change in circumstances." In addressing Father's contempt allegations, the trial court noted several instances where Mother failed to notify Father concerning the Children's schooling, extracurricular activities, and non-emergency medical care and found her "in civil contempt . . . for her failure to comply with the consultation clause of the [PPP]." As punishment, Mother was ordered to pay Father $5,000.00. Furthermore, the trial court cautioned "[t]hat if it is reported that Mother has continued to fail to consult with Father about education, extra-curricular activities, non-emergency medical or religion decisions for the minor [C]hildren then the Court shall modify the [PPP] to give Father final decision-making power over same." The September 8, 2022 order, which was entered by Judge Robert Weiss, was not a final judgment as he ordered the parties to "report for status on Friday, December 16, 2022, at 10:00 a.m. for entry of a final order and determination of where the minor [C]hildren are to attend school for the 2023-2024 school year." After Judge Weiss entered the September 8, 2022 order, but before the scheduled status conference, Judge Damita Dandridge won the August 4, 2022 general election and took Judge Weiss' seat on September 1, 2022.

On October 25, 2022, Father filed a motion, asking Judge Dandrige to reconsider Judge Weiss' decision not to modify the PPP. Mother opposed the motion but did not otherwise object to Judge Weiss' findings of contempt. However, while Father's motion to reconsider was pending, on December 16, 2022, he filed a second petition for contempt against Mother. Therein, he averred that, in addition to the contempt found by Judge Weiss in his September 8, 2022 order, Mother was also guilty of two more counts of civil contempt based on her alleged violation of the PPP provisions requiring her to maintain health insurance for the Children and to provide Father with proof of same, *see supra*. Specifically, Father averred:

> Under the parties' [PPP], Mother is required to maintain reasonable

health insurance on the [C]hildren; but, the parties are to equally pay the [C]hildren's uncovered medical expenses after insurance has paid its portion. So, a change to the [C]hildren's insurance coverage may increase the cost that Father has to pay for his share of uncovered medical expenses.

Since the parties' divorce, the minor [C]hildren have been covered through the parties' employer; however, on December 15, 2022, Mother advised Father that the minor [C]hildren are now covered under her husband's insurance.[2] Prior to December 15th, Mother did not consult with Father prior to changing the [C]hildren's health insurance. It wasn't until Father asked Mother for a copy of the [C]hildren's insurance card did Mother [] disclose that she had unilaterally changed the [C]hildren's health insurance.

***

COUNT I

Mother willfully disobeyed Section II, ¶B of the Permanent Parenting Plan by unilaterally changing the minor [C]hildren's health insurance coverage and then advising Father of the same after the fact;

COUNT II

Mother willfully disobeyed Section II, ¶D of the Permanent Parenting Plan by failing to furnish to Father a copy of the [C]hildren's health insurance cards;

On April 19, 2023, Father filed an amended second petition for contempt, wherein he asserted a third count of contempt based on Mother's alleged violation of the PPP provision awarding joint decision-making on matters concerning the Children's non-emergency health care. Father averred:

The parties' oldest son [Eli] was prescribed an allergy medication that is administered by Mother via a shot taken twice each week[, and] Mother decided to discontinue administering the oldest child's prescribed allergy medication without consulting first with Father.

COUNT III

17. Mother willfully disobeyed Section II, B of the Permanent Parenting Plan by unilaterally discontinuing the minor child's prescribed medication, and then advising Father of the same after the fact;

_____

[2] Mother married her fiancé on May 12, 2022.

- 8 -

On May 30, 2023, Mother filed responses in opposition to Father's second and second amended petitions for civil contempt. Therein, she denied any contempt, stating:

> Mother alleges that Father's attempt to hold Mother in civil contempt for ceasing Eli's allergy shots, which were making Eli ill and were stopped six (6) months before Father filed the present Amended Second Petition, only emphasize that Father does not have the parties' [C]hildren's best interests at heart. Rather, Father's sole focus is attempting to penalize Mother for making minor, day-to-day decisions that are in the [C]hildren's best interests. Mother notes that the parties' [PPP] expressly provides, "Each parent shall make decisions regarding the day-to-day care of a child while the child is residing with that parent. . . ." Mother alleges that her decision to stop administering allergy shots to Eli, which were making him sick, was a decision regarding his day-to-day care.

> ***

> Mother admits that on or about December 15, 2022, Mother timely advised Father that the parties' [C]hildren would now be covered under her husband's health insurance, rather than under Mother's employer's health insurance policy. Mother further notes that Father voiced no objection to the change in the minor [C]hildren's health insurance, and alleges that said change is in the minor [C]hildren's best interests.

> Mother respectfully submits that it was cost prohibitive for her to continue to maintain the [C]hildren on her employer's health insurance policy. Specifically, the cost of Mother's health insurance policy through her employer is $5,729 a year, or $440 a month, whereas the cost of her spouse's health insurance coverage is $4,906 a year, or $409 a month. If Mother was to continue to maintain health insurance coverage through her employer, she and her spouse would be paying $10,635 a year, or $886 a month, for health insurance coverage. There was no additional cost to Mother's spouse to add Mother and the minor children to his health insurance policy, such that the total cost of health insurance for Mother, her spouse, and the parties' minor [C]hildren is $4,906 a year, or $409 a month.

Mother further averred that: "Mother has furnished Father with the parties' [C]hildren's health insurance cards." Based on these averments, Mother asserted that Father's contempt petition constituted an "abusive civil action pursuant to Tennessee Code Annotated § 29-41-101 *et. seq.*, such that Mother should be awarded her attorney fees and suit expenses in defending against same."

Judge Dandridge heard the case on June 27, June 28, August 14, August 15, and August 17, 2023. On December 15, 2023, the trial court entered its Findings of Fact and Conclusions of Law, which were incorporated by reference into its January 11, 2024 Final

Order. As discussed in further detail below, the trial court: (1) granted Father's petition to modify the PPP; (2) entered an amended parenting plan, which named Father primary residential parent, gave the parties equal parenting time, and named Father as the "final decision maker on all major decisions"; (3) entered an amended Child Support Worksheet, ordering Mother to pay $138.06 per month in child support (Father was not ordered to pay child support under the amended worksheet); (4) found Mother in civil contempt for violation of the PPP regarding the Children's health insurance, proof thereof, and her decision to stop administering Eli's allergy shots; (5) ordered Mother to pay Father $88,116.63 in attorney's fees for the contempt; (6) ordered Mother to pay retroactive (to February 28, 2022, the date of Father's original petition) child support in the total amount of $13,637.00; and (7) ordered Mother to pay Ethan's private school tuition for Bodine. Mother appeals.

## II. Issues

Mother raises the following issues as stated in her brief:

I. The trial court erred when it used an incorrect legal standard to change custody, decrease Mother's parenting time, and modify decision-making authority when the overwhelming proof reflected that there was no material change in circumstances that affected the [C]hildren's well-being sufficient to warrant a modification of custody or the residential parenting schedule.

II. The trial court erred when it modified custody and reduced Mother's parenting time, as the overwhelming proof reflected that no material change in circumstances affecting the [C]hildren's best interests occurred pursuant to Tennessee Code Annotated § 36-6-101(a)(2)(B) or (C), and that the [C]hildren were doing well under the agreed-upon Parenting Plan.

III. The trial court erred when it held that Mother was in civil contempt and awarded Father attorney fees totaling $88,116 as compensatory damages due to Mother's modification [of] the [C]hildren's health insurance coverage, alleged failure to provide Father with copies of the [C]hildren's cards, and alleged failure to advise Father before discontinuing Ethan's allergy shots.

IV. The trial court abused its discretion when it held that Mother shall be solely responsible for Ethan's private school tuition at Bodine beginning the 2024-2025 school year, awarded Father retroactive child support of $13,637, and awarded Father attorney fees totaling $88,116.

Appellee asks this Court to award him appellate attorney's fees and costs pursuant to Tennessee Code Annotated section 36-5-103(c).

As an initial matter, we note that Mother's original brief to this Court listed the foregoing issues in the "Table of Contents" section of the brief, and not in a separate "Statement of the Issues" section as contemplated under the Tennessee Rules of Appellate Procedure, which provide, in relevant part, that, "The brief of the appellant shall contain

- 10 -

**under appropriate headings** . . . [a] statement of the issues presented for review." Tenn. R. App. P. 27(a)(4) (emphasis added). As a threshold argument, Father asserts that, in failing to list her appellate issues under a "Statement of the Issues" section, Mother has waived them. We disagree. By order of March 25, 2025, this Court granted Mother's motion to file a supplement to her appellate brief with a separate "Statement of the Issues," which she did. Accordingly, Mother's brief is compliant with Rule 27, and we will address her issues substantively.

### III. Modification of the PPP and Award of Retroactive Child Support

The Tennessee Supreme Court has explained the standard of review for decisions relating to parenting plans as follows:

> In this non-jury case, our review of the trial court's factual findings is de novo upon the record, accompanied by a presumption of the correctness of the findings, unless the preponderance of the evidence is otherwise. *See* Tenn. R. App. P. 13(d); ***Kendrick v. Shoemake***, 90 S.W.3d 566, 570 (Tenn. 2002); ***Hass v. Knighton***, 676 S.W.2d 554, 555 (Tenn. 1984). We review the trial court's resolution of questions of law de novo, with no presumption of correctness. ***Kendrick***, 90 S.W.3d at 569 . . . . [Nonetheless,] determining the details of parenting plans is "peculiarly within the broad discretion of the trial judge.'" ***Suttles v. Suttles***, 748 S.W.2d 427, 429 (Tenn. 1988) (quoting ***Edwards v. Edwards***, 501 S.W.2d 283, 291 (Tenn. Ct. App. 1973)). "It is not the function of appellate courts to tweak a [residential parenting schedule] in the hopes of achieving a more reasonable result than the trial court." ***Eldridge v. Eldridge***, 42 S.W.3d 82, 88 (Tenn. 2001). A trial court's decision regarding the details of a residential parenting schedule should not be reversed absent an abuse of discretion. ***Id***. "An abuse of discretion occurs when the trial court . . . appl[ies] an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice." ***Gonsewski v. Gonsewski***, 350 S.W.3d 99, 105 (Tenn. 2011). A trial court abuses its discretion in establishing a residential parenting schedule "only when the trial court's ruling falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record." ***Eldridge***, 42 S.W.3d at 88.

***Armbrister v. Armbrister***, 414 S.W.3d 685, 692-93 (Tenn. 2013).

The applicable analysis differs depending on whether the trial court is asked to modify a child's custody arrangement or whether it is asked to modify the details of the residential parenting schedule. As this Court recently explained:

> Courts apply a two-step analysis to requests to change the primary residential parent designation. ***Keisling v. Keisling***, 196 S.W.3d 703, 718 (Tenn. Ct. App. 2005). The

- 11 -

threshold issue is whether a material change in circumstance has occurred since the court's prior custody order. *See Armbrister* [], 414 S.W.3d [at] 697-98 []; Tenn. Code Ann. [§] 36-6-101(a)(2)(B). Only if a material change in circumstance has occurred do we consider whether a modification is in the child's best interest. *Armbrister*, 414 S.W.3d at 705. The "determinations of whether a material change of circumstances has occurred and where the best interests of the child lie are factual questions." *In re T.C.D.*, 261 S.W.3d 734, 742 (Tenn. Ct. App. 2007).

*Skowronski v. Wade*, No. M2014-01501-COA-R3-CV, 2015 WL 6509296, at *5 (Tenn. Ct. App. Oct. 27, 2015).

Regarding a material change in circumstance to justify a change in custody, Tenn. Code Ann. § 36-6-101(a)(2)(B) [] provides:

(i) If the issue before the court is a modification of the court's prior decree pertaining to custody, the petitioner must prove by a preponderance of the evidence a material change in circumstance. A material change of circumstance does not require a showing of a substantial risk of harm to the child. A material change of circumstance may include, but is not limited to, failures to adhere to the parenting plan or an order of custody and visitation or circumstances that make the parenting plan no longer in the best interest of the child.

\*\*\*

We note, however, that a lower threshold of proof applies to a material change in circumstance to justify a change in the residential parenting schedule. This Court has recently explained:

Notably, the law regards a change in a parenting schedule differently than a change in the primary residential parent. As this Court has previously explained,

Tennessee now has a different set of criteria for determining whether a material change of circumstance has occurred to justify a modification of a "residential parenting schedule" and the specifics of such a schedule. The amendment, specifically the addition of subsection [Tenn. Code Ann. 36-6-101](a)(2)(C), establishes different criteria and a lower threshold for modification of a residential

- 12 -

parenting schedule. *See Rose v. Lashlee*, No. M2005-00361-COA-R3-CV, 2006 WL 2390980, at *2, n. 3 (Tenn. Ct. App. Aug. 18, 2006) (holding that Tenn. Code Ann. § 36-6-101(a)(2)(C) "sets a very low threshold for establishing a material change of circumstances"). However, the statutory criteria pertaining to a modification of "custody"—the term used in the statute, which we equate to the designation of "primary residential parent" and matters more substantive than a change of schedule-remain unchanged. See Tenn. Code Ann. § 36-6-101(a)(2)(B).

*Scofield v. Scofield*, No. M2006-00350-COA-R3-CV, 2007 WL 624351, at *3 (Tenn. Ct. App. Feb. 28, 2007). Consequently, "a different standard applies when a parent seeks modification of a residential schedule but not the designation of the primary residential parent." *McAdams* [*v. McAdams*, No. E2019-02150-COA-R3-CV,] 2020 WL 4723762, at *3 n. 4 [(Tenn. Ct. App. Aug. 13, 2020)]. Stated differently, "Tennessee courts have required a higher measure of proof when the petitioner seeks a change in custody (*i.e.,* a change in the primary residential parent) than when he or she seeks only a change in the existing parenting schedule." *Tutor v. Tutor*, No. W2019-00544-COA-R3-CV, 2020 WL 1158075, at *2 (Tenn. Ct. App. Mar. 10, 2020); *see also Pippin* [*v. Pippin*], 277 S.W.3d [398] at 407 [(Tenn. Ct. App. June 4, 2008)] ("[B]ecause [f]ather's petition seeks a change of primary residential parent status, *i.e.*, a change of 'custody,' we conclude that the lower threshold contained in Tenn. Code Ann. § 36-6-101(a)(2)(C) simply does not apply.").

*Rushing v. Rushing*, 692 S.W.3d 82, at 89-90 (Tenn. Ct. App. 2023), *perm. app. denied* (Tenn. March 6, 2024) (citing *L.A.S. v. C.W.H.*, No. E2021-00504-COA-R3-JV, 2022 WL 17480100, at *5-6 (Tenn. Ct. App. Dec. 7, 2022)).

Turning to the record, as noted above, the original PPP named Mother the primary residential parent. By his petition, Father asked the trial court to name the parties joint primary residential parents, with equal parenting time. As set out in the proposed amended parenting plan tendered by Father with his petition, he specifically sought "Joint Primary Residential Parents (only if by agreement) Child must reside an equal amount of time with both parents." In its findings of fact and conclusions of law, the trial court noted the qualifying language, "only by agreement," stating:

Father's Petition and Amended Petition to Modify Parenting Plan Order does not include a request to be designated primary residential parent. . . . Although Father's proposed PPP designates "Joint Primary Residential Parent," it is "only if by agreement," which presupposes an equal parenting schedule. Accordingly, the Court finds that Father's petition does not seek a change in primary residential status, i.e., custody, and thus the lower threshold contains in Tenn. Code Ann. § 36-6-101(a)(2)(C) applies.

- 13 -

We disagree. In the first instance, Father's qualifying notations that his request to be named joint residential parent is "only by agreement," and "presupposes an equal parenting schedule," do not change the fact that he seeks a change in the primary residential parent designation, *i.e.* he seeks a change in custody. Indeed, this is the relief the trial court granted. In the amended permanent parenting plan adopted by the trial court and incorporated into its final order, the court clearly changes the Children's primary residential parent from Mother to Father. Specifically, under the "The Primary Residential Parent" heading, the trial court checked the box indicating that Father is now the primary residential parent. Change of the primary residential parent is a change in custody not a change to the parenting schedule. As such, Tennessee Code Annotated section 36-6-101(a)(2)(C), which the trial court applied, is inapplicable. *Pippin*, 277 S.W.3d at 407 ("[B]ecause [f]ather's petition seeks a change of primary residential parent status, *i.e.*, a change of 'custody,' we conclude that the lower threshold contained in Tenn. Code Ann. § 36-6-101(a)(2)(C) simply does not apply."). Having applied an incorrect legal standard, the trial court abused its discretion in granting Father's petition for modification of the PPP. *Gonsewski*, 350 S.W.3d at 105 ("An abuse of discretion occurs when the trial court . . . appl[ies] an incorrect legal standard. . . ."). As such, we vacate the trial court's order modifying the PPP and its entry of a modified Child Support Worksheet.

Concerning the trial court's judgment against Mother for "retroactive child support," the trial court found, in relevant part:

> 208. Child support shall be made retroactive to the date of the filing of Father's Petition to Modify Parenting Plan Order and Child Support, which is February 28, 2022;
> 209. Father is hereby awarded a retroactive child support judgment in the amount of $13,637;
> 210. Mother shall pay Father $138 per month . . . on the first of each month;

Here, there was no basis for an award of retroactive child support. While the case was pending, there was no change in the parties' parenting time. Absent an increase in Father's parenting time, dating back to his original petition, retroactive child support in his favor was unwarranted, and the trial court erred in ordering same. We have vacated the trial court's entry of the amended Child Support Worksheet, and we reverse the trial court's award of retroactive child support against Mother arising from that worksheet. Although, on remand, the trial court may reconsider the questions of modification of the PPP and the Child Support Worksheet, as a point of clarification, any child support obligation on Mother's part can only be awarded prospectively from the date of entry of any future support order. In other words, on remand, the trial court may not charge Mother with retroactive support.

## IV. Civil Contempt and Award of Attorney's Fees

Mother also appeals the trial court's decision to hold her in contempt based on her alleged: (1) failure to notify Father when the Children's health insurance provider was changed; (2) failure to provide Father with new insurance cards for the Children; and (3) decision to stop administering Eli's allergy shots. "A trial court's use of its contempt power is within its sound discretion and will be reviewed by an appellate court under an abuse of discretion standard." *McLean v. McLean*, No. E2008-02796-COA-R3-CV, 2010 WL 2160752, at *3 (Tenn. Ct. App. May 28, 2010) (citing *Outdoor Mgmt., LLC v. Thomas*, 249 S.W.3d 368, 377 (Tenn. Ct. App. 2007)). "[A] trial court will be found to have 'abused its discretion' only when it applies an incorrect legal standard, reaches a decision that is illogical, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party." *In re Estate of Greenamyre*, 219 S.W.3d 877, 886 (Tenn. Ct. App. 2005), *perm. app. denied* (Tenn. Mar. 12, 2007) (internal citations omitted). Likewise, this Court reviews a trial court's award of attorney's fees under an abuse of discretion standard. *See Wright ex rel. Wright v. Wright*, 337 S.W.3d 166, 176 (Tenn. 2011).

Concerning contempt of court, Tennessee Code Annotated § 29-9-102 provides, in relevant part, that "[t]he power of the . . . courts to . . . inflict punishments for contempts of court, shall not be construed to extend to any except the following cases . . . (3) The willful disobedience or resistance of any . . . party. . . to any lawful . . . order . . . of such courts. . . ." "Contempts may be criminal or civil in nature depending on whether the purpose of the contempt is to coerce or to punish." *State v. Turner*, 914 S.W.2d 951, 954 (Tenn. Crim. App. 1995). This Court has previously distinguished between the two types of contempt of court as follows:

> Civil contempt is intended to benefit a litigant while criminal contempt is punishment for an offense against the authority of the court. Civil contempt is imposed to compel compliance with an order, and parties in contempt may purge themselves by compliance. Criminal contempt, on the other hand, is punishment for failing to comply with an order, and the contemptuous party cannot be freed by eventual compliance.

*Duke v. Duke*, No. M2013-00624-COA-R3-CV, 2014 WL 4966902, at *30 (Tenn. Ct. App. Oct. 3, 2014) (quoting *Sherrod v. Wix*, 849 S.W.2d 780, 786 n.4 (Tenn. Ct. App. 1992) ).

In the present action, it is undisputed that the contempt proceedings were civil in nature. Regarding civil contempt proceedings, the Tennessee Supreme Court has explained:

> Civil contempt claims based upon an alleged disobedience of a court order have four essential elements. First, the order alleged to have been violated must be "lawful." Second, the order alleged to have been violated must be clear, specific, and unambiguous. Third, the person alleged to have

violated the order must have actually disobeyed or otherwise resisted the order. Fourth, the person's violation of the order must be "willful."

The threshold issue in any contempt proceeding is whether the order alleged to have been violated is "lawful." A lawful order is one issued by a court with jurisdiction over both the subject matter of the case and the parties. *Vanvabry v. Staton*, 88 Tenn. 334, 351-52, 12 S.W. 786, 791 (1890); *Churchwell v. Callens*, 36 Tenn. App. 119, 131, 252 S.W.2d 131, 136-37 (1952).

*** 

The second issue involves the clarity of the order alleged to have been violated. A person may not be held in civil contempt for violating an order unless the order expressly and precisely spells out the details of compliance in a way that will enable reasonable persons to know exactly what actions are required or forbidden. *Sanders v. Air Line Pilots Ass'n Int'l*, 473 F.2d 244, 247 (2d Cir. 1972); *Hall v. Nelson*, 282 Ga. 441, 651 S.E.2d 72, 75 (2007); *Marquis v. Marquis*, 175 Md. App. 734, 931 A.2d 1164, 1171 (2007); *Cunningham v. Eighth Judicial Dist. Ct. of Nev.*, 102 Nev. 551, 729 P.2d 1328, 1333-34 (1986); *Petrosinelli v. People for the Ethical Treatment of Animals, Inc.*, 273 Va. 700, 643 S.E.2d 151, 154-55 (2007). The order must, therefore, be clear, specific, and unambiguous. *See Doe v. Bd. of Prof'l Responsibility*, 104 S.W.3d [465,] 471 [ (Tenn. 2003)]; *Long v. McAllister-Long*, 221 S.W.3d [1,] 14 [ (Tenn. Ct. App. 2006)].

* * *

The third issue focuses on whether the party facing the civil contempt charge actually violated the order. This issue is a factual one to be decided by the court without a jury. *See Pass v. State*, 181 Tenn. 613, 620, 184 S.W.2d 1, 4 (1944); *Sherrod v. Wix*, 849 S.W.2d 780, 786 (Tenn. Ct. App. 1992). The quantum of proof needed to find that a person has actually violated a court order is a preponderance of the evidence. *Doe v. Bd. of Prof'l Responsibility*, 104 S.W.3d at 474. Thus, decisions regarding whether a person actually violated a court order should be reviewed in accordance with the standards in Tenn. R. App. P. 13(d).

The fourth issue focuses on the willfulness of the person alleged to have violated the order. The word "willfully" has been characterized as a word of many meanings whose construction depends on the context in which it appears. *Spies v. United States*, 317 U.S. 492, 497, 63 S. Ct. 364, 87 L.Ed. 418 (1943); *United States v. Phillips*, 19 F.3d 1565, 1576-77 (11th Cir. 1994). Most obviously, it differentiates between deliberate and unintended conduct. *State ex rel. Flowers v. Tenn. Trucking Ass'n Self Ins. Group*

*Trust*, 209 S.W.3d [602,] 612 [(Tenn. Ct. App. 2006)]. . . .

In the context of a civil contempt proceeding under Tenn. Code Ann. § 29-[9]-102(3) . . . willful conduct

> consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent. Conduct is 'willful' if it is the product of free will rather than coercion. Thus, a person acts 'willfully' if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing.

*State ex rel. Flowers v. Tenn. Trucking Ass'n Self Ins. Group Trust*, 209 S.W.3d at 612 (citations omitted). Thus, acting contrary to a known duty may constitute willfulness for the purpose of a civil contempt proceeding. *United States v. Ray*, 683 F.2d 1116, 1127 (7th Cir. 1982); *City of Dubuque v. Iowa Dist. Ct. for Dubuque County*, 725 N.W.2d 449, 452 (Iowa 2006); *Utah Farm Prod. Credit Ass'n v. Labrum*, 762 P.2d 1070, 1074 (Utah 1988). Determining whether the violation of a court order was willful is a factual issue that is uniquely within the province of the finder-of-fact who will be able to view the witnesses and assess their credibility. Thus, findings regarding "willfulness" should be reviewed in accordance with the Tenn. R. App. P. 13(d) standards.

After determining that a person has willfully violated a lawful and sufficiently clear and precise order, the court may, in its discretion, decide to hold the person in civil contempt. *See Robinson v. Air Draulics Eng'g Co.*, 214 Tenn. 30, 37, 377 S.W.2d 908, 912 (1964). The court's decision is entitled to great weight. *Hooks v. Hooks*, 8 Tenn. Civ. App. (Higgins) 507, 508 (1918). Accordingly, decisions to hold a person in civil contempt are reviewed using the abuse of discretion standard of review. *Hawk v. Hawk*, 855 S.W.2d 573, 583 (Tenn. 1993); *Moody v. Hutchison*, 159 S.W.3d 15, 25-26 (Tenn. Ct. App. 2004).

*Konvalinka v. Chattanooga-Hamilton Cty. Hosp. Auth.*, 249 S.W.3d 346, 354-58 (Tenn. 2008) (footnotes omitted). If a trial court finds a party in contempt, Tennessee Code Annotated § 36-5-103(c) provides, in relevant part:

A prevailing party may recover reasonable attorney's fees, which may be fixed and allowed in the court's discretion, from the non-prevailing party in any criminal or civil contempt action or other proceeding to enforce, alter, change, or modify any decree of alimony, child support, or provision of a permanent parenting plan order, or in any suit or action concerning the adjudication of the custody or change of custody of any children, both upon the original divorce hearing and at any subsequent hearing.

Concerning the Children's health insurance, it is undisputed that Mother changed

the Children's insurance provider from BlueCross to Aetna. The Children's new coverage, which was effective June 1, 2022, was provided by Mother's husband's employer. As set out above, in her response to Father's second petition for contempt, *supra*, Mother asserted that the change to Aetna resulted in less out-of-pocket costs, while still covering the Children's established providers. Father asserted that Mother's failure to give him prior notice of the change in the Children's insurance was an act of contempt. We disagree.

In the first instance, there is evidence to suggest that Father knew of Mother's intention to change the Children's insurance coverage prior to her doing so, or at least at or about the same time that Mother made that change. Trial Exhibit 11 is a text exchange between Father and Mother that occurred on June 14, 2022. In the conversation, Father asked Mother, "Are you switching over insurance or no," to which Mother replied, "Yes we will." Father then asked, "When will that take effect," to which Mother responded, "Not sure. [New husband] did something last night." During her testimony, Mother discussed the June 14, 2022 text exchange, to-wit.

> Q [to Mother]. Now, going to your message, when [Father] asked you about when this insurance would go into effect, you responded again by stating: We haven't done it yet, so I don't have anything. Is that what it says in that text message?
> A. Yes.
> Q. In other words, you consulted with [Father] before switching the [C]hildren to your spouse's insurance?
> A. Yes.
> Q. So at the time you sent this message, the [C]hildren were not covered under your spouse's health insurance, right?
> A. At that time, looking back, yes, they were, but I did not know that. I did not think it started until July. I did not know that it would retroactively go to June.

From the foregoing, the parties were discussing the Children's insurance in June 2022 at or near the time that Mother changed the coverage. Even if we allow that the Children were already enrolled in Aetna at the time of the foregoing text exchange, Mother states that she was unaware that the new insurance was in place at the time of the text exchange, so there is no indication that Mother intentionally, or willfully, withheld information from Father, or that she intended to do so. *State ex rel. Flowers*, 209 S.W.3d at 612 ("A person acts 'willfully' if . . . she . . . intends to do what . . . she is doing."). Rather, she forthrightly told Father that she planned to switch the Children's coverage.

Notwithstanding the foregoing text exchange, Father insists that Mother did not notify him of the insurance change and, in failing to do so, violated the PPP. As set out in context above, the PPP provides that "[r]easonable health insurance on the . . . C]hildren will be . . . maintained by the [M]other[.]" Contrary to Father's argument, there is no requirement that Mother consult with Father before procuring the required health

insurance.  Under the PPP, joint decision making applies only to decisions concerning the Children's education, non-emergency health care, religious upbringing, and extracurricular activities. However, concerning the Children's health insurance, Mother is simply required to "maintain[]" such insurance, which she did in this case.  In fact, on cross examination, Father conceded that the Children's health insurance coverage never lapsed, and Mother continued to provide coverage as contemplated under the PPP, to-wit:

> Q [to Father]. And just to be clear, if you'll bear with me momentarily. And your . . . ex-wife has had that coverage, at least according to your Exhibit 13, certainly since June of '22, correct?
> A. Yes, but we didn't—I didn't receive that information until—
> Q. I understand. My question, though, is  not when you received. It's that the [C]hildren have had health insurance that your . . . ex-wife in this instance, was obligated to maintain, correct?
> A. Apparently, since June l[, 2022]. . . .
>
> ***
>
> Q.  . . . You're unaware of any lapse in health insurance coverage that the [C]hildren have had since the entry of the [PPP]
> A. Yes, I'm not aware of any lapse.

Father's own testimony establishes that Mother did not violate the PPP because she "maintained" health insurance on the Children at all times. In short, the facts do not support a finding that Mother "actually violated the order," which is a necessary criterion for a finding of civil contempt. ***Konvalinka***, 249 S.W.3d at 356.

Likewise, there is no evidence that Mother **willfully** violated the PPP requirement that, "Proof of continuing coverage shall be furnished to the other parent annually or as coverage changes."  Father sought a finding of contempt on his assertion that Mother failed to provide him with the Children's insurance cards for 2022, after she changed the Children's coverage.  It is undisputed that, in December 2022, Mother provided Father with the Children's insurance cards for 2023.

In the first instance, the plain language of the PPP does not specifically require Mother to provide the Children's insurance cards to Father.  Rather, Mother must provide some proof of coverage when coverage "changes" or "annually."  Although the required "proof" could be in the form of insurance cards, the PPP does not specify that this is the only "proof" Mother could provide.  ***Konvalinka***, 249 S.W.3d at 355 (citations omitted) ("A person may not be held in civil contempt for violating an order unless the order expressly and precisely spells out the details of compliance in a way that will enable reasonable persons to know exactly what actions are required or forbidden."). Notwithstanding the lack of specificity in the PPP concerning what "proof" is required, it is undisputed that Mother provided the Children's new insurance information to each of

- 19 -

their providers, whom the parties had named and agreed to under the PPP. Nonetheless, the trial court found contempt based, *inter alia*, on its finding that "Mother admits that she did not provide Father with the [C]hildren's updated health insurance cards for 2022 as coverage changed." We have reviewed the testimony cited by the trial court. Although Mother could have sent Father the new cards for 2022 when she received them in August of 2022, based on the parties' conversations, there can be no doubt that Father knew about the change in the Children's insurance provider at or near the time Mother made the change (*i.e.* June 2022, when the foregoing text exchange occurred). As such, Mother's admission that she did not provide the cards in August of 2022 does not, *ipso facto*, show that she willfully failed to do so. Indeed, Mother's undisputed testimony indicates that her failure to provide new 2022 insurance cards to Father in August of 2022 was unintentional:

> Q [to Mother]. All right. Now, let's talk about health insurance cards. . . . Did [Father] ever call and voice any concern or say anything about: I took the [C]hildren to the doctor and there was an issue regarding health insurance?
> A. No, I never heard anything like that.
> Q. Okay. Does [Father] have health insurance cards for the [C]hildren?
> A. He does.
> Q. And after you received this petition [for contempt], how long did it take you to get him health insurance cards?
> A. I believe it was just a couple of days when we had gotten the 2023 cards.
> Q. And explain what you received, if anything, when the insurance was switched from—BlueCross to Aetna.
> A. My husband gets like a computerized card. It's all online, and you have to, like, print it out on a piece of paper . . . . So that's all we had.
> Q. And when you realized that [Father] was trying to hold you in civil contempt in December of '22 for the insurance change and/or consultation and/or health insurance cards, what did you do?
> A. I sent him the new card when we got it for 2023.
> Q. And has he had that?
> A. Yes.
> Q. Did the [Children's] providers already have the insurance information. . . .
> A. Yes, sir. . . . They all had it.

> ***

> Q. Now, as we sit in court today as it relates to the December 16 [contempt] petition, is there anything that you've done to violate a court order?
> A. Nothing intentionally. I mean, looking back, yes, I wish I would have sent [the cards,] but when you're working, you have three kids, we were dealing with the schools. I just didn't think about it. And it wasn't an issue until I got the contempt charge, so I didn't have reason to think about it again.

As discussed above, willful conduct, in the context of civil contempt, "consists of acts or

failures to act that are intentional or voluntary rather than accidental or inadvertent." ***State ex rel. Flowers***, 209 S.W.3d at 612. Furthermore, based on the undisputed testimony, Mother tendered the Children's insurance cards to Father in December 2022. This satisfied the PPP requirement for **annual** notification of proof of insurance. Even allowing that Mother's failure to tender the Children's new 2022 insurance cards earlier than December 2022 was a violation of the PPP at the time Father filed his petition for civil contempt, Mother had purged herself of the contempt prior to the June 27, 2023 hearing on Father's petition. Thus, she was not in civil contempt at the time of the hearing. *See* ***Doe v. Bd. Of Prof'l Responsibility***, 104 S.W.3d 465, at 473-74 (Tenn. 2003) (explaining that the purpose of civil contempt is to coerce compliance with the court's orders for the benefit of the private party who has suffered a violation of rights. When the contemnor cures the contemptuous conduct, he or she is no longer in civil contempt). As we have noted:

> This Court has repeatedly held that issues raised on appeal regarding civil contempt findings are moot if the contemnor has already purged himself or herself of contempt by the time the issue reaches this Court. "A case, or an issue in a case, becomes moot when the parties no longer have a continuing, real, live, and substantial interest in the outcome." ***Hooker v. Haslam***, 437 S.W.3d 409, 417 (Tenn. 2014). For instance, in ***Simpkins v. Simpkins***, 374 S.W.3d 413, 417 (Tenn. Ct. App. 2012), a husband was found in civil contempt for failure to pay health insurance premiums and failure to provide proof of life insurance. On appeal to this Court, the husband argued that the trial court erred by finding him in civil contempt without finding that he had the ability to comply with the orders he allegedly violated. *Id*. Because the husband had already "cured his contemptuous conduct" by paying the premiums and providing proof of insurance, we held that "the issue of civil contempt is moot." *Id*. at 418.
>
> In ***Pfister v. Searle***, No. M2000-01921-COA-R3-JV, 2001 WL 329535, at *2 (Tenn. Ct. App. Mar. 28, 2001), the trial court found a mother in civil contempt and ordered her jailed until she delivered the parties' child for visitation. The mother was released when the child was produced the next day. *Id*. at *4. On appeal, the mother argued that the evidence did not support a finding that she willfully violated the order because it was confusing. *Id*. We held that "because the [mother] complied with the court's order to produce her child, thereby purging her civil contempt, that judgment is now moot, and we decline to address it." *Id*. at *1. "The validity of the trial court's order finding her in civil contempt [was] moot." *Id*. at *4. *See also* ***In re A.G.***, No. M2007-0799-COA-R3-JV, 2009 WL 3103843, at *5 (Tenn. Ct. App. Sept. 28, 2009) (concluding that a mother's challenge to her sentence for criminal contempt was moot when she had already served the sentence and it was "unclear what meaningful relief lies within the power of this court to give her at this point"); ***Boggs v. Boggs***, No. M2006-00810-COA-R3-CV, 2007 WL 2353156, at *5 (Tenn. Ct. App. Aug. 17, 2007) (deeming the appellant's arguments regarding two civil contempt findings moot where the

appellant paid the amount ordered and was released from custody).[3]

***Stark v. Stark***, No. W2019-00650-COA-R3-CV, 2020 WL 507644, at \*4 (Tenn. Ct. App. Jan. 31, 2021); *accord **Luker v. Luker***, No. M2021-00758-COA-R3-CV, 2021 WL 6066802 (Tenn. Ct. App. Dec. 22, 2021).  Based on the foregoing, the trial court's finding of contempt based on Mother's failure to provide proof of the Children's insurance coverage is reversed.

Concerning the trial court's finding of contempt based on Mother's decision to discontinue Eli's allergy shots, the trial court's order states only:

COUNT III

A. [In] [d]eciding to discontinue a minor child's [allergy shots, Mother] intentionally misrepresented to Father that she consulted Eli's doctor before she stopped administering the shots.
B. Pursuant to Tenn. Code Ann. § 29-9-104, Mother's foregoing conduct constitutes willful and deliberate civil contempt of the PPP.

These are the trial court's only findings regarding this count of contempt.  Concerning paragraph B, *supra*, we note that the trial court's reliance on Tennessee Code Annotated section 29-9-104 appears to be misplaced. That statute provides, in part, that, "[i]f the contempt consists in an omission to perform an act which it is yet in the power of the person to perform, the person may be imprisoned until such person performs it."  By its plain language, section 29-9-104 contemplates imprisonment as a punishment for contempt, but Mother was not imprisoned in this case.

In its only substantive finding made in support of its decision to hold Mother in civil contempt for discontinuing Eli's allergy shots, the trial court faults Mother for "intentionally misrepresented to Father that she consulted with Eli's doctor before [doing so]."  Although the trial court provides no citation to the record in support of this finding, we have reviewed Trial Exhibit 12, a text exchange between Mother and Father, which provides:

[Father:] Also, why didn't you tell me you were taking Eli off allergy shots[.]
I asked him last night how his shots were going to. He told me he's not on them anymore.

---

[3] The Tennessee Supreme Court has noted "a limited number of exceptional circumstances that make it appropriate to address the merits of an issue notwithstanding its ostensible mootness[.]," including: (1) when the issue is of great public importance or affects the administration of justice; (2) when the challenged conduct is capable of repetition and evades judicial review; (3) when the primary dispute is moot but collateral consequences persist; and (4) when a litigant has voluntarily ceased the challenged conduct. *City of Memphis v. Hargett*, 414 S.W.3d 88, 96 (Tenn. 2013) (citing ***Lufkin v. Bd. of Prof'l Responsibility***, 336 S.W.3d 223, 226 (Tenn. 2011)).

[Mother:] I didn't take him off. He hasn't needed them since the pollen hasn't been too bad. We've continued with the Zyrtec and Singular without problems. He's been less symptomatic since being off.

[Father:] It takes up to [a year] for the allergy shots to start kicking in. Why did you consult me about this?

[Mother:] We will revisit it when we go for his yearly in May. He's improved greatly and even being outside doesn't make him break out like it used to . . . .

[Father:] . . . But this is exactly what the court's talking about. You have to consult me about medical stuff just make the decisions on your own.

[Mother:] I didn't take him off.  We took a break.

[Father:] Yes, but I have a right to know, and I should be involved in the decision making. Especially when I have the same conditions that he does. I have a lot of insight into allergies and dealing with them.

[Mother:] He was so snotty on the shots.

[Father:] That's because his body is learning to build up an immunity. Did you ask the allergy doctor about taking him off the shots or did you just make that decision on your own?

[Mother:] Yes they said he could. Was going to talk to the doctor more at his yearly.

Based on its findings, the trial court focused on Mother's response to Father's question, "Did you ask the allergy doctor about taking him off the shots . . .," to which Mother replied, "Yes, they said I could."  In her testimony, Mother explained that she did not consult Eli's allergy doctor before stopping the shots.  However, she explained that the paperwork she was given when the shots were prescribed indicated that the shots could be stopped and restarted, to-wit: "[T]he paperwork that we received with the allergy shots, it did say that you could stop it and then how to get back on if you needed to."  Mother went on to explain:

Q [to Mother]. Okay. And are you saying that when Mr. Smithwick asked if you had asked the allergy doctor about taking Eli off the shots, your response, yes, they said he could, that's not a true statement?

A. I didn't—I just said, yes.

Q. Yes or no whether that's a true statement or not?

A. I did not talk to the doctor, no.

Q. So that statement was not true?

A. It was true in the fact that I read the sheet from the allergy clinic. I did not speak to an individual at the allergy clinic.

Q. . . . [S]]o you're—you would agree with me that the response you just gave right now is not responsive to the question that Mr. Smithwick asked you in that question in this text message?

A. No, I wasn't responding to talking to an actual doctor.

Q. All right. But that's not what you said in that text message, right?

- 23 -

A. No. I said: (Reading) Yes, they said he could.

Q. And that's not true?

A. The sheet from the allergy clinic, but an individual—I did not speak with an individual.

The foregoing exchange goes directly to the question of whether Mother willfully disobeyed the mandates of the PPP in stopping Eli's shots. Although the trial court's order does not address the willfulness criterion *vis-à-vis* this allegation of contempt, we note that, if, as Mother claims, the instructions given by the doctor indicated that the medication could be stopped and restarted, then her decision, as stated in the text chain, that she "didn't take [Eli] off [the shots;] [w]e took a break," would be justified under the doctor's previous instructions, thus negating a finding of willfulness.

Furthermore, in her response in opposition to Father's second amended petition for contempt, *see supra*, Mother alleges that the "allergy shots [] were making Eli ill," and she asserts that her decision to stop the shots fell under the PPP provision, which authorized "[e]ach parent [to] make decisions regarding the day-to-day care of a child while the child is residing with that parent. . . ." In short, Mother alleges that her decision to stop administering allergy shots to Eli, which were making him sick, was a decision regarding his day-to-day care. If, as Mother asserts, she was acting under the day-to-day care provision of the PPP, there is a question whether she actually violated the PPP. The trial court's order does not address Mother's argument, nor does it cite the language of the PPP on which she relies to defend her position to stop Eli's shots. Rather, from its findings, the trial court focused on Mother's alleged "intentional misrepresentation" concerning consultation with Eli's doctor, but whether Mother spoke with the doctor is not the gravamen of this count of contempt. Instead, the question is whether Mother acted willfully in deciding to stop the medication. This question necessarily requires resolution of both Mother's contention that the paperwork given by the doctor authorized her decision, and her assertion that the administration of Eli's allergy shots falls under the "day-to-day care" provision of the PPP. The trial court did not address these questions. However, from our review, and based on the foregoing discussion, we conclude that the evidence does not preponderate in favor of the trial court's conclusion that Mother was in willful civil contempt of the PPP based on her decision to stop Eli's shots.

For the foregoing reasons, the trial court's findings of contempt regarding the change in the Children's health insurance, their insurance cards, and Eli's allergy shots are reversed. Having reversed the finding of contempt, there is no basis for the trial court's award of $88,116.63 in attorney's fees under Tennessee Code Annotated section 36-5-103(c), *supra*,[4] and we also reverse that award.

---

[4] According to its order, the trial court awarded attorney's fees "pursuant to Tenn. Code Ann. § 36-5-103(c) and § 29-9-104." In the absence of contempt by Mother, we have held that Father is not entitled to attorney's fees under section 36-5-103(c). As to the trial court's reliance on section 29-9-104, as noted

## IV. Private School Tuition

Mother asserts that the trial court erred in ordering her to pay Ethan's private school tuition. We agree. In its findings of fact and conclusions of law, the trial court merely states that, "Mother shall be responsible for paying Ethan's private school tuition at Bodine beginning the 2024-2025 school year." The trial court does not explain the basis of its decision. The only other reference to financial responsibility for private school tuition is found in the trial court's findings of fact and conclusions of law under the heading, "The Parties' Assumption of Financial Responsibility for Tuition at Bodine School, which provides:

> 110. The parties agreed that Ethan would continue attending Bodine School for the 2022-23 school year, but Mother opposed the maternal grandparents paying for Ethan's 2022-23 school year tuition.
> 111. According to the maternal grandparents, they expressed their willingness "to cover the cost of private schooling going forward" as recently as April 4, 2022.
> 112. Mother told Father that her parents would not pay for tuition.
> 113. It was not until after she began dating [her fiancé] that Mother opposed the maternal grandparents paying for the [C]hildren's private school tuition.
> 114. [Mother's fiancé] makes three times as much as Mother; for 2022, he made over $300,000.
> 115. For the 2022-23 school year, Mother and Father paid Ethan's tuition totaling $25,823.55. Father paid $12,362.50.

The foregoing findings are not sufficient to justify the trial court's decision to charge Mother with Ethan's private school tuition for 2024-2025.

The determination of child support in Tennessee is governed by the Child Support Guidelines promulgated by the Tennessee Department of Human Services in accordance with Tennessee Code Annotated § 36-5-101(e). ***Richardson v. Spanos***, 189 S.W.3d 720, 725 (Tenn. Ct .App.2005). The statute requires the court to apply the Child Support Guidelines as a rebuttable presumption. Tenn. Code Ann. § 36-5-101(e)(1)(A); Tenn. Comp. R. & Regs. 1240-2-4-.07(1)(a). A court may order a deviation from the amount of support if the deviation complies with the requirements of the Child Support Guidelines, and "[t]he amount or method of such deviation is within the discretion of the tribunal." Tenn. Comp. R. & Regs. 1240-2-4-.07(1)(b). However, the trial court is required to "state in its order the basis for the deviation and the amount the child support order would have been without the deviation." ***Id***. "In deviating from the Guidelines, primary consideration

---

above, that statute provides, in part, that, "[i]f the contempt consists in an omission to perform an act which it is yet in the power of the person to perform, the person may be imprisoned until such person performs it." Mother was never imprisoned, so the trial court's reliance on section 29-9-104 was error.

must be given to the best interest of the child for whom support under these Guidelines is being determined." *Id*.

Under the Child Support Guidelines, payment of private school tuition constitutes a deviation from the Guidelines, to-wit:

(d) Extraordinary Expenses.

The Schedule includes average child rearing expenditures for families based upon the parents' monthly combined income and number of children. Extraordinary expenses are in excess of these average amounts and are highly variable among families. For these reasons, extraordinary expenses are considered on a case-by-case basis in the calculation of support and are added to the basic support award as a deviation so that the actual amount of the expense is considered in the calculation of the final child support order for only those families actually incurring the expense. These expenses may be, but are not required to be, divided between the parents according to each parent's PI.

1. Extraordinary Educational Expenses.

(i) Extraordinary educational expenses may be added to the presumptive child support as a deviation. Extraordinary educational expenses include, but are not limited to, tuition, room and board, lab fees, books, fees, and other reasonable and necessary expenses associated with special needs education or private elementary and/or secondary schooling that are appropriate to the parents' financial abilities and to the lifestyle of the child if the parents and child were living together.
(ii) In determining the amount of deviation for extraordinary educational expenses, scholarships, grants, stipends, and other cost-reducing programs received by or on behalf of the child shall be considered.
(iii) If a deviation is allowed for extraordinary educational expenses, a monthly average of these expenses shall be based on evidence of prior or anticipated expenses and entered on the Worksheet in the deviation section.

Tenn. Comp. R. & Regs. 1240-2-4-.07(2)(d).

Here, Ethan's private school tuition is not included on the amended Child Support Worksheet, and there is certainly no explanation in the trial court's order as to how it reached its decision to deviate from the Guidelines in charging Ethan's tuition to Mother. In other words, the trial court did not make the required factual determinations that private school was appropriate based upon the facts of the case and, in failing to do so, violated Tenn. Comp. R. & Regs. 1240-2-4-.07(2)(d)(1)(ii); *see also **In re Andrea A.R**.*, 2012 WL 397475, at *7 ("The extraordinary educational expense guideline mandates that the trial

court shall, first, consider whether private elementary or secondary schooling 'is appropriate to the parents' financial abilities and the lifestyle of the child if the parents and the child were living together.'") Rather, from the trial court's sparse findings, *supra*, it focused on the maternal grandparents' and the Children's stepfather's ability to pay, not on the parents' ability to pay. Respectfully, it is neither the grandparents' nor the stepfather's responsibility to pay for the parties' Children's private education. Accordingly, Mother should not be charged with Ethan's tuition merely because her family members have the ability and/or willingness to pay. From the trial court's findings, Mother and Father split Ethan's tuition for 2023-2024, yet the trial court makes no finding as to why this arrangement should be disturbed for the school year 2024-2025. From our review, there is nothing in the record to support the trial court's finding that Mother should be solely responsible for Ethan's tuition, and that decision is vacated. Should the trial court revisit this question on remand, we caution that it should apply the Child Support Guidelines as a rebuttable presumption. Should the trial court deviate from those Guidelines, it should endeavor to explain its decision to do so.

As a final matter, Father asks for appellate attorney's fees and costs under Tennessee Code Annotated § 36-5-103(c), which provides, in part, that "[a] **prevailing** party may recover reasonable attorney's fees . . . ." Here, Father is not the prevailing party and, so, is not entitled to an award of attorney's fees. Therefore, his request for same is denied.

## V. Conclusion

For the foregoing reasons, we vacate the trial court's order adopting a modified PPP and child support worksheet. We also vacate the trial court's decision to charge Mother with Ethan's private school tuition. The trial court's order is otherwise reversed, and the case is remanded for such further proceedings as may be necessary and are consistent with this opinion. Costs of the appeal are assessed to the Appellee, Fred Barksdale Smithwick, IV. Execution for costs may issue if necessary.

s/ Kenny Armstrong
KENNY ARMSTRONG, JUDGE

- 27 -